Ognian Gavrilov (SBN 258583)
Michael S. Wilcox (SBN 215269)
**GAVRILOV & BROOKS**
2315 Capitol Avenue
Sacramento, CA 95816
Telephone: (916) 504-0529
Facsimile: (916) 727-6877
Email:
Email: mwilcox@gavrilovlaw.com

Michael Coleman (SBN 295462)
**GAVRILOV & BROOKS**
515 S. Figueroa Street, Suite 1235
Los Angeles, CA 90071
Telephone: (213) 528-5500
Email: mcoleman@gavrilovlaw.com

Attorneys for Plaintiff
PHOONG LAW CORPORATION

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHOONG LAW CORPORATION, a California corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>PRIMARY WAVE MEDIA, LLC, a New York limited liability company; and WALKER ADVERTISING, LLC, a California limited liability company,.<br><br>        Defendants. | Case No. _____<br><br>**COMPLAINT FOR**<br><br>1.    Breach of Covenant of Good Faith and Fair Dealing;<br>2.    Fraud in the Inducement;<br>3.    Civil Conspiracy to Defraud;<br>4.    Trademark Infringement;<br>5.    Federal Unfair Competition;<br>6.    State Unfair Competition; and<br>7.    Intentional Interference with Prospective Business Relations.<br><br>**DEMAND FOR JURY TRIAL** |

PLAINTIFF, PHOONG LAW CORPORATION, a California corporation ("Phoong Law" or "Plaintiff"), alleges against DEFENDANTS, PRIMARY WAVE MEDIA, LLC, a New York limited liability company ("Wave Media"), WALKER ADVERTISING, LLC, a California limited liability company ("Walker Advertising") (Wave Media and Walker Advertising, collectively, "Defendants"), as follows:

## JURISDICTION AND VENUE

1.     Phoong Law brings it claims for federal unfair competition and trademark infringement pursuant to 15 U.S.C. § 1051 *et seq.* This Court has jurisdiction over this action pursuant to: (i) 28 U.S.C. § 1331; (ii) 28 U.S.C. §§ 1338(a) and (b); (iii) 15 U.S.C. § 1121; and (iv) 28 U.S.C. § 1367(a) (supplemental jurisdiction).

2.     The events giving rise to the claims alleged herein occurred, among other places, within this judicial district and at least one defendant has its primary place of business located within this judicial district. Venue in the Central District of California is proper pursuant to 28 U.S.C. § 1391(b).

## PARTIES

3.     At all relevant times hereto, Phoong Law was and is a California corporation with its principal place of business located in the County of Sacramento, within the State of California.

4.     Plaintiff is informed and believes, and thereon alleges that at all times relevant hereto, defendant Wave Media was and is a New York limited liability company, with its primary place of business located in the County of Westchester, within the State of New York.

5.     Plaintiff is informed and believes, and thereon alleges that at all times relevant hereto, defendant Walker Advertising was and is a California limited liability company, with its primary place of business located in the County of Los Angeles, within the State of California,

6.     At all times mentioned herein, each of the Defendants named in the caption was an agent, employee, and/or partner of the remaining defendants and, in committing the acts herein alleged, was acting within the scope of such agency, employment and/or partnership with the permission, authority and/or consent of its co-defendants.

## GENERAL ALLEGATIONS

7.     This is an action in law and equity for breach of contract, fraud, unfair business practices,

and intellectual property infringement committed by the advertising agency Plaintiff employed who exploited its access to the inner workings of Plaintiff's marketing plan to enrich itself.

**A.    <u>Plaintiff's Business</u>**

8.    Phoong Law is a California based personal injury law firm which handles cases throughout the State.  Attorney Anh Phoong Salcedo ("Attorney Phoong") is Phoong Law's principal. Attorney Phoong is also the face of Phoong Law.

9.    Over the past eleven years, Attorney Phoong and Phoong Law have established a respected brand throughout the State.  Attorney Phoong's billboards, radio, and bus advertisements have made her presence ubiquitous throughout California, elevating her to the status of a celebrity and "icon". *See*, D'Onfro, J. (2023, November 13). Bay Area Icon Anh Phoong is bringing her catchphrase to 400 billboards in LA. <u>SFGate</u>. (*https://www.sfgate.com/local/article/anh-phoong-iconic-billboards-la-expansion-18480147.php*); *see also*, Thao, P. (2024, June 20). Meet Anh Phoong, L.A.'s latest billboard celebrity, serving looks with Humberto Leon. <u>Los Angeles Times</u>. (*https://www.latimes.com/lifestyle/image/story/2024-06-20/anh-phoong-l-a-lawyer-billboard-celebrity-styled-by-humberto-leon*).

10.    Phoong and Phoong Law have expended substantial sums of money on marketing and have become famous for their distinctive billboard and bus advertisements, which include the catchphrase "Something Wrong? Call Anh Phoong" followed by a phone number for prospective personal injury clients to call: 866-GOT-PAIN (866-468-7246) (the "Number").  One such billboard is shown below:



11.     Due to Attorney Phoong's visibility and notoriety in the personal injury space, she and Phoong Law have obtained more than $200,000,000 in settlements and judgments over the past eleven years.

**B.     Phoong Law's Federal Trademark Rights**

12.     Plaintiff is the owner of U.S. Trademark Registration Serial No. 97700484 for the word-mark "(866) GOT-PAIN" (the "Mark").  This registration is for *[l]egal services, namely, providing customized documentation, information, counseling, advice and consultation services in all areas of Personal Injury* in international class 045; U.S. classes 100 and 101.  Plaintiff's registration claims a date of first use in commerce of August 2016.  A true and correct copy of the Federal Trademark Registration for the Mark is attached hereto as **Exhibit A**.

**C.     Wave Media**

13.     Wave Media markets itself as "one of the nation's leading providers of toll-free vanity numbers."  Wave Media markets its services to the public as "Ring Boost," and maintains the website *ringboost.com*.

14.     On or about January 4, 2017, Wave Media and Phoong Law entered into an Intelligent Number Bundled Marketing Services Agreement (the "Contract") whereby, *inter alia*, all calls made to the Number from the following area codes would be transferred directly to the Firm: 707, 530, 916, 510, 415, 628, 925, 650, 408, 669, 209, 831, and 559.  Plaintiff is informed and believes, and thereon alleges that these area codes collectively comprise all of Northern California (the "Territory").  A true and correct copy of the Contract is attached hereto as **Exhibit B**.

15.     In exchange for Wave Media granting Phoong Law exclusive rights to the Number for the Territory, Phoong Law paid Wave Media, *inter alia*, a yearly marketing fee of $3,000, plus telecom charges of $.06 per minute plus applicable taxes, after the first 100 minutes of calls to the Number each month.

16.     In marketing the Contract to Attorney Phoong and Phoong Law, representatives from Wave Media expressly stated that all calls to the Number from exchanges falling outside the Territory would receive a busy signal, or be directed back to Ring Boost.  Further, Wave Media representatives

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

4
COMPLAINT

assured Attorney Phoong and the Phoong Law that none of Plaintiff's competitors would receive calls made to the Number from exchanges falling outside the Territory. Attorney Phoong and the Phoong Law expressly relied upon this representation in deciding not to contract for exclusive rights to the Number nationwide.

17. On or about February 9, 2024, Wave Media and the Firm entered into a Toll-Free Marketing Services Agreement ("Updated Agreement") whereby the Firm expanded the Territory to include all calls made to the Number from the following area codes, which include new exchanges for Northern California and all exchanges for Southern California: 562, 619, 626, 661, 805, 858, 909, 949, 951, 213, 310, 424, 323, 747, 818, 760, 442, 714, 657, 350, 837, 369, 738, and 341. Based on the Updated Agreement, Attorney Phoong and Phoong Law had the exclusive right to directly receive all calls made to the Number from any exchange in Northern and/or Southern California (the "Updated Territory"). A true and correct copy of the Updated Agreement is attached hereto as **Exhibit C**.

18. In exchange for Wave Media granting Phoong Law exclusive rights to the Number for the Updated Territory, Phoong Law paid Wave Media, *inter alia*, a monthly marketing fee of $350, plus telecom charges of $.05 per minute plus applicable taxes, after the first 100 minutes of calls to the Number each month.

19. Once again, in marketing the Updated Agreement to Attorney Phoong and Phoong Law, representatives of Wave Media claimed that all calls to the Number from exchanges falling outside the Updated Territory would receive a busy signal. Further, Wave Media representatives assured Attorney Phoong and Phoong Law that none of Plaintiff's competitors would receive calls made to the Number from exchanges falling outside the Updated Territory. As late as October 1, 2024, a Ring Boost sales representative, John Castillo, again stated to Attorney Phoong, in writing, that calls made from exchanges outside the Territory would receive a busy signal or would roll over to Ring Boost.

**D.    Walker Advertising**

20. Walker Advertising operates a personal injury attorney referral service ("Referral Service") throughout the State of California commonly known as 1-800-THE-LAW2. The Referral Service maintains a website at the URL *1800thelaw2.com* (the "Referral Website").

21.    Phoong Law is a client of Walker Advertising.  Under the agreement between Walker Advertising and Phoong Law, Walker Advertising provides leads for customers potentially in need of a personal injury attorney.

22.    Because the Walker Advertising's Referral Service operates in California and refers prospective clients to not just Phoong Law but to California personal injury attorneys generally, including attorneys in the Updated Territory, Walker Advertising and the Referral Service are in direct competition with Attorney Phoong and Phoong Law.

**E.    Defendants' Misconduct.**

**1.    Wrongful Diversion of "866-GOT-PAIN" Calls.**

23.    Contrary to Wave Media's repeated assertions that calls originating from area codes outside of the Updated Territory would receive busy signals–an assertion upon which Plaintiff has relied–on information and belief, Wave Media has entered into a business arrangement with Walker Advertising whereby calls made from area codes falling outside the Updated Territory are diverted to Walker Advertising's Referral Service.

24.    Walker Advertising and the Referral Service directly receive calls made to the Number from exchanges falling outside of the Updated Territory.  Thus, a call made to 1-866-GOT-PAIN from a cell phone with a New York exchange will go directly to Walker Advertising and the Referral Service, even if the call was made in California and the caller is seeking to reach Phoong Law.  The call is diverted to a California call-center ("Call-Center") run by Walker Advertising.

25.    Plaintiff is informed, believes, and on that basis alleges that the majority of persons calling the Number from area codes outside of the Updated Territory were not calling from outside of California (as plaintiff only markets and advertises in California), but merely possessed cell phones with numbers that originated outside of California and were actually placing those calls while in California and in response to Phoong Law's extensive advertising campaign within California. These callers were intentionally looking for Phoong Law and either searched her name or law firm on google.  Phoong Law purchased google ads, and expected all calls to go to them; not any other law firm.

26.    When callers specifically ask to speak with Attorney Phoong or Phoong Law, one of her associates, or state they are trying to reach Phoong Law generally, the person answering the call ("Call-

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

Center Operator") does not inform the caller they have reached the wrong number.  Rather, Plaintiff is informed and believes, and thereon alleges that the Call-Center Operators are specifically trained not to directly identify who they work for, or that they are merely an attorney referral service.

27.     Plaintiffs are further informed and believe, and thereon allege that the Call-Center Operators are trained to generally follow a scripted set of steps: (1) identify if the caller was injured in an accident; (2) obtain the caller's name, age, phone number, and email address; (3) identify where the caller was hurt; (4) identify where the caller lives; and (5) tell the caller to hold while the Call-Center Operator connects him/her to an attorney who can help with the case.

28.     Plaintiff is informed, believes, and on that basis alleges that in many instances persons reaching the Walker Advertising Call-Center and asking if they have reached "1-866-GOT-PAIN"  or Anh Phoong or Phoong Law and are mis-informed that they have.  For example, in or around October 1, 2024, Plaintiff's agent, posing as a prospective client, dialed the Number from a phone having a Tennessee area code.  This elicited the following exchange (quoted in relevant part):

Agent:    In case the call drops, our return number is 888-972-0932

Caller:    Okay

Agent:    Can I start with your cell phone number, please?

Caller:    So I have a question though.  What was your number again?

Agent:    It was 888-972-0932.  That's our return number.

Caller: That's not what I thought I marked.  I thought I marked "1-866-GOT-PAIN."  Is
         this not "1-866-GOT-PAIN?"

Agent:    **It is 866** . . . that is just our return call number, in case the call drops.

Although the agent in this case attempted to avoid saying Plaintiff's Mark, he appeared to confirm to the caller that the Call-Center was "866-GOT-PAIN," thereby claiming ownership of Plaintiff's Mark and directly infringing the Mark.  On information and belief, Plaintiff asserts that instances of such infringement are not isolated and that similar exchanges have occurred with many consumers.

29.     The first page of Plaintiff's website includes a link that may be clicked by a consumer so as to activate an application that automatically dials the Number.  Thus, a consumer need not translate the Mark into the Number when attempting to contact Phoong Law.  This is done through automation;

however, where the automatic call is made from an area code outside the Updated Territory, such a call is also automatically diverted to Defendants' Call-Center. Plaintiff is informed and believes, and thereon alleges that Wave Media, by virtue of its business association with Plaintiff, became aware of the possibility of diverting calls and realized that it could exploit this loophole for its own benefit and to the detriment and at the expense of Plaintiff. There is no way the calls could be forwarded to Walker Advertising without Wave Media's participation as they are the only ones who own the leasing rights to the 866-GOT-PAIN number.

30. Plaintiff is informed and believes, and thereon alleges that even in cases where the caller informs the Call-Center Operator that they are represented by Attorney Phoong and the Firm, Call-Center Operators attempt to continue with the intake and to refer the caller to one of the Referral Service attorneys. In such cases, the Call-Center Operators inform the caller that one of their attorneys can offer an allegedly needed "second opinion."

31. Plaintiff is informed and believes, and thereon alleges that Walker Advertising, the Referral Service, and/or the Call-Center Operators at all times were and are aware that diverted callers are attempting to reach Attorney Phoong and Phoong Law. Plaintiff is informed and believes, and thereon alleges that Walker Advertising and the Referral Service are intentionally attempting to create customer confusion by: (1) contracting with Wave Media to receive calls to the Number made from outside exchanges, even when calls are made within the Updated Territory; and (2) leading callers to believe they will be connected to an attorney affiliated with Attorney Phoong and Phoong Law.

## 2. Infringing Use of Meta-Tags.

32. Plaintiff has determined that the results of a web search for the Mark conducted within the State of California and outside the State differ, with Walker Advertising's Referral Service being promoted in searches made within the State of California.

33. Plaintiff is informed and believes, and thereon alleges that one or both of Defendants have purchased the use of Plaintiff's Mark as a key word search from various search engines, thereby promoting certain results, such as Defendants' services, in response to a search for the Mark.

34. Defendant's use of the Mark as a key word search in this manner is likely to cause consumer confusion as the Mark does not itself identify the name of its owner. Often consumers have

chosen to contact Plaintiff in response to momentarily seeing the Mark while passing a billboard on the highway.  If in response to a search for 866-GOT-PAIN, such a consumer is presented with two choices, that of Phoong Law and Walker Advertising, the consumer may unintentionally choose Walker Advertising, even though the consumer's intent was to choose the rightful owner of the Mark.

**F.    Defendants' Coordinated Effort to Defraud Plaintiff.**

35.    Walker Advertising's involvement in the misdirection and misappropriation of clients attempting to reach Phoong Law at 1-866-GOT-PAIN is particularly egregious given Walker Advertising's role as a referral service provider to Phoong Law.  Effectively, with the cooperation of Wave Media, Walker Advertising has been able to offer customer leads to Phoong Law and demand compensation that could have been generated by Phoong Law's own advertising campaign.

36.    Given Walker Advertising's knowledge of Phoong Law's operations and marketing efforts in combination with the insider knowledge possessed by Wave Media, Phoong Law's phone operator, the coordinated malfeasance of these two Defendants in crafting this scheme is akin to an act of corporate espionage perpetrated against Attorney Phoong and her law firm.

**G.    Plaintiff's Damages and Entitlement to Remedies.**

37.    Plaintiff is informed and believes, and thereon alleges that each and all of Defendants' wrongful actions as described in the foregoing have resulted in actual customer confusion in the  marketplace as to the source of services provided in connection with the Mark.

38.    Plaintiff is informed and believes, and thereon alleges that Walker Advertising and the Referral Service have diverted thousands of prospective clients from Phoong Law to attorneys within Walker Advertising's attorney network.  Plaintiff is further informed and believes, and thereon alleges that call diversions have prevented Phoong Law from obtaining hundreds-of-millions of dollars-worth of settlements and judgments on behalf of clients that otherwise would have been clients of Phoong Law.  As a result of Defendants' unlawful conduct, Phoong Law has lost tens-of-millions of dollars.

39.     As a result, Plaintiff is entitled, among other remedies, to recover its monetary damages, according to proof, to an order enjoining Defendants' future wrongful conduct, and to such  other remedies as the Court deems just.

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

# FIRST CAUSE OF ACTION

## (Breach of the Covenant of Good Faith and Fair Dealing)

## (Against Wave Media)

40.     Plaintiff incorporates herein by reference each of the allegations contained in Paragraphs 1 through 39 of this Complaint.

41.     Plaintiff and Wave Media entered into the Contract, attached hereto as Exhibits B, and the Updated Agreement, attached hereto as Exhibit C.  Such agreements were valid and enforceable.

42.     Plaintiff performed all, or substantially all, of the significant acts that the agreements required it to do, or was excused from having to do certain things the agreement required it to do.  All conditions required by the agreements for Wave Media's performance, if any, occurred.

43.     In every contract or agreement there is an implied promise of good faith and fair dealing. This implied promise means that each party will not do anything to unfairly interfere with the right of the other party to receive the benefits of the contract.  Defendant Wave Media breached this implied promise with respect to the Contract and the Updated Agreement by acting dishonestly or with an intent to mislead or take unfair advantage of Plaintiff and Wave Media was not faithful to its duties and obligations to Plaintiff under these agreements.

44.     In both the Contract and the Updated Agreement, the term "Territory" was intended to mean a certain defined geographic area – Northern California in the Contract and the entirety of California in the Updated Agreement – that was defined with reference to certain area codes for convenience.  Such definition is reasonable given that Plaintiff's is a law firm located in Northern California and licensed to practice in California and conducts its extensive marketing campaign for the Mark in California.

45.     Wave Medial; however, knew that there would be persons located within the geographic territory that would have cell phone numbers with area codes that were outside the Territory and Updated Territory as defined by specific area codes.  Wave Media intentionally misled Plaintiff as to its intent to market such customers to Plaintiff's competitors.

46.     Wave Media additionally breached its duty to act in good faith by repeatedly falsely asserting to Plaintiff, both prior to Plaintiff's entry into the Contract and prior to the execution of the

Updated Agreement and during the performance thereof, that calls to the Number from exchanges falling outside the Updated Territory would receive a busy signal. Further, Wave Media falsely assured Plaintiff that none of Plaintiff's competitors would receive calls made to the Number from exchanges falling outside the Territory or Updated Territory.

47.     As a direct, legal, and proximate result of Wave Media's intentional dishonesty, Plaintiff has suffered and, if Wave Media's conduct is not stopped, will continue to suffer damages as set forth in paragraph 38 of this Complaint and is entitled to remedies as set forth in Paragraph 39.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

<u>**SECOND CAUSE OF ACTION**</u>

**(Fraud in the Inducement)**

**(Against Wave Media)**

48.     Plaintiff incorporates herein by reference each of the allegations contained in Paragraphs 1 through 47 of this Complaint.

49.     As set forth in paragraphs 16 and 19 of this Complaint, Wave Media asserted to Plaintiff, both before entry into the Contact and Updated Agreement, respectively and during the performance thereof, that: (1) calls to the Number from exchanges falling outside the Territory, and later Updated Territory, would receive a busy signal; and (2) none of Plaintiff's competitors would receive calls made to the Number from exchanges falling outside the Territory. Such assertions included, but were not limited to, the assertion made by Wave Media representative, John Castillo, to Attorney Phoong by email on October 1, 2024.

50.     Such assertions were in fact false and the true facts were that: (1) Wave Media always intended that calls made to the Number from exchanges falling outside the Territory, and later Updated Territory, would be diverted to the Walker Advertising Referral Service; and (2) that once such diversion occurred, such potential customers would be marketed by the Referral Service to Plaintiff's competitors.

51.     Wave Media made or authorized the misrepresentations for the purpose of and with the intent of inducing Plaintiff to rely thereon and to act in a manner advantageous to Wave Media.

52.     Plaintiff in fact relied on Wave Media and its agents to deal honestly and fairly, on the truth of Wave Media's representations.

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

53.     Until recently, Plaintiff was unaware of the falsity of the misrepresentations and acted in reasonable reliance on the truth of the misrepresentations.  Had Plaintiff known the truth of such misrepresentations prior to the execution of the Contract, it may not have entered into that agreement.  Likewise, had it known the truth of such misrepresentations prior to the execution of the Updated Agreement, it may not have entered into that agreement.  Likewise, had Plaintiff known the truth of such representations during the performance of such agreements, it may have altered its marketing campaign so as to prevent the usurpation of Plaintiff marketing efforts for the benefit of competitors.

54.     As a direct, legal, and proximate result of Wave Media's conduct, Plaintiff has suffered damages as set forth in paragraph 38 of this Complaint and is entitled to remedies, including those set forth in Paragraph 39.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

## THIRD CAUSE OF ACTION

### (Conspiracy to Defraud)

### (Against All Defendants)

55.     Plaintiff incorporates herein by reference each of the allegations contained in Paragraphs 1 through 54 of this Complaint.

56.     Defendants between themselves have planned a course of action and carried out that plan intending to deprive Plaintiff of the lawful right to enjoy the benefits of its marketing and development of the goodwill associated with the 866-GOT-PAIN Mark.

57.     In so doing, Defendants have leveraged their various contractual relationships with Plaintiff in combination with a course of conduct that has involved misinformation, misrepresentation and deceit that constitutes fraud.

58.     Plaintiff is informed and believes, and thereon alleges that each of the Defendants has individually contributed to the joint effort to defraud Plaintiff.

59.     Defendants have engaged in their conspiracy for their mutual benefit of each and to the detriment of Phoong Law.

60.     As a direct, legal, and proximate result of Defendants' conspiracy to commit fraud, Plaintiff has suffered damages as set forth in paragraph 38 of this Complaint and is entitled to remedies,

including those set forth in Paragraph 39.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

### FOURTH CAUSE OF ACTION

**(For Trademark Infringement, 15 U.S.C. § 1114)**

**(Against All Defendants)**

61.     Plaintiff incorporates herein by reference each of the allegations contained in Paragraphs 1 through 60 of this Complaint.

62.     Plaintiff, Phoong Law, is the owner of the federally registered trademark 866-GOT-PAIN, U.S. Trademark Registration Serial No. 97700484.

63.     Without Plaintiff's authorization of permission, Defendants have used the Mark to deceptively misdirect calls made by customers intending to reach Plaintiff from numbers with area codes associated with certain geographic territories.

64.     As set forth in paragraph 28 of this Complaint, in some instances, Call-Center operators speaking to wrongfully diverted customers, have falsely claimed that the Call-Center is the owner of the Mark and the rightful destination of an attempt to contact 1-866-GOT-PAIN.

65.     As set forth in paragraph 29 of this Complaint, Defendants have intentionally taken advantage of the link offered to customers on Plaintiff's website and associated automated dialing system, causing some customers who click that link (which is the Mark) to be diverted to Defendants' call center when such customers believe that they are connecting the Phoong Law.

66.     As set forth in paragraphs 32 to 34 of this Complaint, Defendants have contracted with various internet search engines to use the Mark to promote their businesses in consumer searches intended to locate Plaintiff by way of searching for the Mark.

67.     In all such instances, Defendants' unlawful and unethical use of the Mark has caused significant consumer confusion in the marketplace as to the origin of the legal services provided by Plaintiff.

68.     As a direct, legal, and proximate result of Defendants' infringement, Plaintiff has suffered damages as set forth in paragraph 38 of this Complaint and is entitled to remedies, including those set forth in Paragraph 39.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

### FIFTH CAUSE OF ACTION

**(For Federal Unfair Competition, 15 U.S.C. section 1125(a))**

**(Against All Defendants)**

69.    Plaintiff incorporates herein by reference each of the allegations contained in Paragraphs 1 through 68 of this Complaint.

70.    Section 43(a) of the Laham Act imposes liability upon any person or entity that uses in connection with any service or the offering thereof "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact," which is likely to cause confusion with the association of such person or entity with another.

71.    As set forth in the foregoing Complaint, Defendants wrongful conduct in diverting calls made to the Number underlying the Mark has resulted in actual consumer confusion as to the source of legal services associated with the Mark.

72.    Defendants' wrongful conduct in diverting calls made to the Number and other wrongful conduct as set forth in this Complaint meet the foregoing definition and, specifically, constitute false or misleading representations of fact.

73.    As a direct, legal, and proximate result of Defendants' violation of 15 U.S.C. § 1125(a), Plaintiff has suffered damages as set forth in paragraph 38 of this Complaint and is entitled to remedies, including those set forth in Paragraph 39.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

### SIXTH CAUSE OF ACTION

**(For California State Unfair Competition)**

**(California Business and Professions Code section 17200, *et sec.*)**

**(Against All Defendants)**

74.    Plaintiff incorporates herein by reference each of the allegations contained in Paragraphs 1 through 73 of this Complaint.

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

75.    Defendants' wrongful conduct in diverting calls made to the Number and other wrongful conduct as set forth in this Complaint constitute one or more "unlawful, unfair or fraudulent business act" addressed by California's unfair competition laws.

76.    As a direct, legal, and proximate result of Defendants' unlawful, unfair, and fraudulent acts, Plaintiff has suffered damages as set forth in paragraph 38 of this Complaint and is entitled to remedies, including those set forth in Paragraph 39.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

**<u>SEVENTH CAUSE OF ACTION</u>**

**(For Intentional Interference with Prospective Business Relations)**

**(Against All Defendants)**

77.    Plaintiff incorporates herein by reference each of the allegations contained in Paragraphs 1 through 76 of this Complaint.

78.    Defendants have intentionally interfered with an economic relationship between Plaintiff and multiple potential customers that would likely have resulted in economic benefit to Plaintiff.

79.    Defendants were aware of and knew of the likelihood of the relationship at the time of the interference, and were and are aware that their interference would prevent Plaintiff from entering into any representation agreement with such potential customers.

80.    The Defendants have wrongfully diverted customers who were attempting to contact Plaintiff through the use of deceptive business practices.  Moreover, as further alleged in paragraph 30 of this Complaint, Defendants have wrongfully diverted persons having existing business with Plaintiff and, thereafter, interfered with the relationship between Plaintiff and its customers.

81.    By engaging in this conduct, Defendants intended to disrupt the relationship or knew that disruption of the relationship was certain or substantially certain to occur.  Defendants' conduct has disrupted the relationship or potential relationship between Plaintiff and its customers in many instances.

82.    Defendants conduct was a substantial factor in causing harm to Plaintiff in an amount to be determined according to proof at trial.

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

83.     The aforementioned conduct of Defendants was committed with malice and/or oppression by one or more of the officers, directors, or managing agents of Defendants, so as to justify an award of exemplary and punitive damages.

84.     As a direct, legal, and proximate result of Defendants' interference with Plaintiff's prospective customers, Plaintiff has suffered damages as set forth in paragraph 38 of this Complaint and is entitled to remedies, including those set forth in Paragraph 39.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.     For compensatory damages in an amount to be proven at trial;

2.     For general damages and special damages in amounts according to proof;

3.     For punitive and exemplary damages according to proof;

4.     For costs of suit;

5.     For injunctive relief;

6.     For Plaintiff's reasonable attorney fees pursuant to the fee shifting provision of Section 12 of the Standard Terms and Conditions of both the Contract and the Updated Agreement;

7.     For pre-judgment and post-judgment interest at the legal rate on the sum of damages awarded pursuant to 19 U.S.C. § 1961 and/or California Civil Code §§ 3287 and 3288; and

8.     For such other and further relief as the Court may deem proper.

/ / /

/ / /

/ / /

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated: January 30, 2025                    **GAVRILOV & BROOKS**

/s/Ognian Gavrilov
_____
Ognian Gavrilov
Michael Coleman
Michael S. Wilcox
Attorneys for Plaintiff

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

# EXHIBIT A

# United States of America
## United States Patent and Trademark Office

# (866) GOT-PAIN

**Reg. No. 7,436,504**

**Registered Jul. 09, 2024**

**Int. Cl.: 45**

**Service Mark**

**Principal Register**

Phoong Law Corporation  (CALIFORNIA CORPORATION), DBA Phoong Law
2725 Riverside Blvd
Sacramento, CALIFORNIA 95818

CLASS 45: Legal services, namely, providing customized documentation, information, counseling, advice and consultation services in all areas of Personal Injury

FIRST USE 8-00-2016; IN COMMERCE 8-00-2016

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

No claim is made to the exclusive right to use the following apart from the mark as shown: "(866)"

SER. NO. 97-700,484, FILED 12-01-2022





Director of the United States
Patent and Trademark Office



**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years\***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

# EXHIBIT B

## Intelligent Number Bundled Marketing Services Agreement

This Intelligent Number Bundled Marketing Services Agreement, including the Standard Terms and Conditions attached hereto and incorporated by reference (this "Agreement") is entered into by and between Primary Wave Media, LLC, a Delaware limited liability company with an address of 49 Marble Ave., Suite 102, Pleasantville, New York 10570 (the "Company") and **Phoong Law Corp..,** with an address 1860 Howe Avenue, Suite 250 Sacramento, CA 95825 (the "Co-User"), dated as of **January 4th, 2017** for certain Bundled Marketing Services (as hereinafter defined).

1.       During the Term (as hereinafter defined) of this Agreement, Company will provide the Bundled Marketing Services defined below and grant the Co-User the exclusive right to use the telephone number **1-866-468-7246** (the "Number") in the Territory (as hereinafter defined), **collectively known as (the "Marketing Package") in the Territory**, subject to any and all rules, obligations and conditions under applicable tariffs (including, without limitation, tariffs in relation to the non-payment for service, abuse of service or fraud), statutory and common law and any other applicable laws or regulations promulgated by agencies having jurisdiction over the subject matter hereof. Co-User acknowledges that Company may provide services to third parties using the Number in geographic areas other than the Territory during the Term of this Agreement or in the Territory upon termination or expiration of this Agreement.  In addition and included with the fees described below, during the Term, Company shall provide to Co-User the following services in accordance with the terms and conditions of this Agreement: a) vanity toll free consulting services, including but not limited to, deployment, IVR and routing solutions, tracking and reporting options in connection with the Location(s) (as hereinafter defined) designated by Co-User from time to time; b) vanity toll free marketing assistance and strategy provided to Co-User and its advertising agency on an as needed basis; c) access to special offers given to other Company licensees from outside vendors; and d) the Intelligent Number Services defined below. The services set forth in a) through d) above, together with the Number, shall be collectively referred to herein as the "Bundled Marketing Services." Company will provide the services set forth in a) and b) above on an on-going basis during the Term, and, unless otherwise mutually agreed in writing by the parties, Company's total time spent on such services shall not exceed three (3) hours per month. As used herein, "Territory" shall mean area codes 707, 530, 916, 510, 415, 628, 925, 650, 408, 669, 209, 831 & 559 in California. As used herein, "Location(s)" shall mean the place or places designated from time to time in writing by Co-User as the location to which calls to the Number shall be routed to **916-475-6466. Co-User understands and agrees that the Number is integral to the Bundled Marketing Services; that the Number has been assigned to the Company directly through a RespOrg utilizing the SMS/800 Database; and that subscribership of the Number cannot be transferred from Company to Co-User or any other party.**

2.       This Agreement shall be effective on the date of its execution (the "Effective Date") and shall have an initial term of one (1) year (the "Initial Term"), unless terminated by Company in accordance with Paragraph 2 of the Standard Terms and Conditions hereof.  At the end of the Initial Term, or any Renewal Term as defined below, Co-User shall have the option to renew for one (1) year to five (5) additional years (the term of any such renewal being referred to herein as a "Renewal Term") by giving Company an irrevocable written notice of such renewal at least ninety (90) days prior to the expiration of the then-current Initial Term or Renewal Term. If Co-User fails to provide Company with either a notice of renewal or a notice of cancellation at least ninety (90) days prior to the expiration of the then-current Initial Term or Renewal Term, this Agreement shall be automatically renewed for additional successive one (1) year terms, with all other terms and conditions set forth herein in full force and effect. The Initial Term and any Renewal Terms shall be collectively referred to herein as the "Term."

3.       (a)       Co-User shall pay the following amounts to Company: (i) a yearly marketing fee of **$3,000.00** (the "Yearly Fee"), with the first Yearly Fee due upon execution of this Agreement; (ii) all telephone charges billed by any and all telecommunications carrier(s), together with all Federal, State, municipal and all other local taxes, surcharges and regulatory fees of any description billed by any such telecommunications carrier(s) ("Telecom Charges") and (iii) upon the execution of this Agreement, a **$0** set-up fee ("Set-Up Fee"). (The Telecom Charges, together with the Monthly Fee, the Set-up Fee and the Text Fees, are hereinafter referred to as the "Billed Charges"), which are attributable to Co-User's use of the Number.  **The Telecom Charges shall be $0.06 per minute plus applicable taxes, after the first included 100 minutes per month**.  Co-User may receive billing statements and receipts from Company for Telecom Charges and Text Fees when Company is acting as a billing agent for the underlying telecommunications carrier. If Company is not acting as a billing agent for the underlying telecommunications carrier, Co-User will be billed directly by the telecommunications carrier and shall pay the Telecom Charges and Text Fees to such carrier when due. Co-User will be charged a fee of $25 for each key word change made to the Intelligent Number Service platform, after the initial one (1) keyword has been chosen. Co-User warrants, represents, acknowledges and agrees that Co-User shall be solely responsible for and shall pay any and all

Billed Charges incurred on and after the Effective Date as provided in (b) below. Upon each Renewal Term hereof, Company shall have the right to increase the Monthly Fee at any time or times, provided that increases shall not exceed five percent (5%), during any one (1) year period, based on the Monthly Fee of the last month of the preceding term. In the event that the underlying telecommunications carrier notifies Company of a rate change on Company that increases the per minute/per text charge, Company may increase the Telecom Charges or the Text Fees to Co-User.

        (b)        Company will bill Co-User monthly, in advance, for the Monthly Fee. All Billed Charges shall be paid by credit card on which Co-User, or a principal of Co-User, is an authorized signatory. The credit card shall be valid, in good standing, and able to incur new charges. Certain telecommunications carriers may require advanced payment. By the undersigned's signature below, the undersigned, on behalf of Co-User and the undersigned, hereby irrevocably authorizes and directs Company, on behalf of the telecommunications carrier of Company's choice to bill Co-User **an advanced payment of fifty dollars ($50.00), to pre-pay the Telecom Charges**, then again each time the Billed Charges account balance falls below ten-dollars ($10.00), in the event the Company's selected telecommunications carrier requires such advance payment. A credit card authorization form ("Authorization Form") is attached hereto as Schedule 1 and incorporated herein by this reference and the undersigned, on behalf of Co-User and the undersigned shall complete and execute the Authorization Form upon the execution of this Agreement. Co-User will keep the credit card on file current, and will immediately provide Company with updated credit card information should the credit card on file expire or be cancelled, suspended or unable to incur new charges. Failure to pay the Billed Charges within 5 days after the billing due date any month during the Term may result in termination of the Bundled Marketing Services (or the Agreement pursuant to Paragraph 2 of the Standard Terms and Conditions) and, at the Company's sole discretion, a reconnect fee of $250 will be due in order to reinstate the Bundled Marketing Services for the remaining duration of the Term, provided, however, that the reconnect fee, if allowed by the Company, may only be paid within 30 days of the date that the late payment became due. After 30 days, Co-User shall have no option to reconnect or reinstate the Bundled Marketing Services and the Company may freely enter into contracts with third parties concerning the Number in its sole discretion. Interest shall accrue at the rate of 1% per month on all amounts not paid within 10 days of the billing statement and processing charges will apply if a payment is declined ($10 per credit card decline, $20 per returned EFT). If collection efforts are required, Co-User shall be liable to Company for all costs of collection, including reasonable attorney's fees and fees and expenses of any outside collection agencies.

    4.       Co-User and its shareholders, directors, officers, employees, agents, contractors, successors and assigns, affiliates and subsidiaries (such parties being collectively referred to herein as "Co-User Representatives") shall indemnify and hold Company and its shareholders, directors, officers, employees, agents, contractors, successors and assigns, affiliates and subsidiaries ( such parties being collectively referred to herein as "Company Representatives") harmless of and from any and all costs and expenses (including, without limitation, reasonable attorneys' fees), losses, claims, liabilities or obligations, incurred by Company or its Representatives arising out of Co-User's or Co-User Representatives' acts or inactions relating to its or their use of the Bundled Marketing Services, the Intelligent Number Services, or any other acts or omissions of Co-User and/or the Co-User Representatives s related to the subject matter of this Agreement including any negligent or willful or reckless act by Co-User or the Co-User Representatives or due to any breach of this Agreement. **IN NO EVENT SHALL COMPANY OR ITS SUPPLIERS' OR COMPANY REPRESENTATIVES' LIABILITY TO CO-USER OR CO-USER REPRESENTATIVES REGARDLESS OF CAUSE OR FORM OF ACTION, EXCEED THE VALUE OF THE MONTHLY FEE OF THE MONTH PRECEDING THE INCIDENT GIVING RISE TO SUCH DAMAGES. IN NO EVENT SHALL COMPANY OR COMPANY REPRESENTATIVES BE LIABLE TO CO-USER OR ANY OTHER PERSON, FIRM OR ENTITY IN ANY RESPECT, WITHOUT LIMITATION, FOR INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, ACTUAL, OR PUNITIVE DAMAGES, OR ANY LOST PROFITS OF ANY KIND.** Co-User and Co-User Representatives agree that Company shall not be responsible for any interruption of service caused by any reason whatsoever whether or not subject to the control of Company. In the unlikely event of a service outage, Company will refund Co-User's Monthly Fee, on a pro-rata basis, for the length of the service outage. If a service problem occurs, Co-User agrees to notify Company immediately by calling 914-200-0000 or emailing support@primarywave.com.

    5.       Co-User understands and agrees that Company shall at all times remain the subscriber of record and end user for the Number during the Term and afterwards. Co-User shall have no ownership, leasehold, or proprietary interest in the Number. Co-User agrees that it shall use its good faith efforts to ensure that the Number remains utilized with active telephonic traffic during the Term. Company will have total and complete control of which carrier carries Intra/Inter LATA traffic. Co-User has no rights to become the subscriber of record of the Number, to port the Number to a different carrier, to submit any letter of authorization to any carrier or Resp Org or to

encourage or assist any other third party to do so. Any and all rights to the Number will be retained by Company. If Co-User attempts to remove or removes any Number from its current RespOrg, it will be considered a breach of this Agreement by Co-User and, in addition to Company's rights under Section 2 of the Standard Terms and Conditions, Company will charge Co-User an inconvenience fee of $500 upon the first instance, $1,000 upon the second instance and $5,000 for any instance thereafter. Co-User will cooperate and use good faith efforts to ensure the return of the Number to Company.  Co-User acknowledges Company's right, title, and interest in and to the subscription rights to the Numbers and will not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of that right, title, and interest, or to encourage or assist any other third party to do so. In connection with Co-User's use of the Number, Co-User will not in any manner represent that it has any ownership in the Number and Co-User acknowledges that use of the Number will not create in Co-User's favor any right, title, or interest in or to the Number.  Co-User understands and agrees that Company is not a telecommunications carrier and is not providing telecommunications services to Co-User under any applicable federal or state statute, regulation, rule, order or guidance.  Co-User understands and agrees that the telecommunications services are provided by telecommunications carriers of Company's selections and that Company is not Co-User's telecommunications provider.  Rather, Company is providing the Bundled Marketing Services specified herein.  Co-User understands and agrees that its payment to Company is the Monthly Fee for the Bundled Marketing Services; the underlying telecommunications carrier is imposing any charges for telecommunications and text services, and that carrier collects any due taxes, surcharges, or regulatory fees. Company may act as a billing agent for the underlying telecommunications carrier.  While Co-User may receive a billing statement from Company in its capacity as a billing agent, the Telecom Charges and Text Fees are imposed by the underlying telecommunications carrier and the taxes, surcharges and regulatory fees are charged by the underlying telecommunications carrier rather than Company.

6.      This Agreement, together with the Standard Terms and Conditions attached hereto and incorporated herein by this reference, constitutes the entire agreement between Company and Co-User as to the subject matter hereof, and supersede all previous agreements, warranties or representations, oral or written, which may have been made between Company and Co-User as to the subject matter hereof.

        IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

ACCEPTED AND AGREED TO:

_____
Primary Wave Media, LLC

ACCEPTED AND AGREED TO:

DocuSigned by:

_____
0097496A1C6F4BF...
Anh Phoong – Phoong Law Corp.
Anh  Phoong                             Ap

_____
Print Name & Title

        1/4/2017

_____
Date

DocuSign Envelope ID: C81CA54C-44dF-4F28-8698-351BCBD080F9
Case 2:25-cv-00840    Document 2    Filed 01/30/25    Page 25 of 34    Page ID #:27

4 of 6

## STANDARD TERMS AND CONDITIONS

1. Co-User warrants, represents, acknowledges and agrees as follows: (a) Co-User has the full right and power to enter into and fully perform this Agreement and to make the representations, warranties and covenants contained herein, has entered into the Agreement freely and voluntarily, and is empowered to execute the Agreement; (b) Company has not made any statement or representation to Co-User regarding any fact relied upon by Co-User in entering into this Agreement, and Co-User has not relied upon any statement, representation or promise made by Company in executing the Agreement, except as expressly stated in the Agreement; (c) Co-User shall be solely responsible for and shall pay any and all charges, fees and/or any other sums payable in connection with Co-User's use of the Number, including, without limitation, all amounts payable pursuant to Paragraph 4 of the Agreement; (d) There exists, at commencement of the Agreement and for all periods thereunder, no legal reason that Company should deny services to Co-User; that Co-User is of legal majority age (*i.e.*, 18 years of age or older in most jurisdictions), in the case Co-User is an individual; and that Co-User's use of the Number is not for any illegal or injurious purpose or purposes. Co-User represents and warrants that Co-User will not intercept or attempt to intercept the communications of others using the Number or interfere with others' use of the Number in any manner. Co-User will comply with all applicable laws, regulations, and legal requirements applicable to Co-User's use of the Number; (e) Co-User shall test the Number, without charge, before marketing such Number or incurring other expenditures; (f) Co-User is sharing the use of the Number and agrees that it has no ownership or leasehold interest in the Number. Co-User has no right to port the Number to a different telecommunications provider than chosen by Company and has no right to take any action or to assist or encourage others to take any action to become the subscriber of record of the Number or to hold itself out to third parties as a subscriber or as having authority over the Number; and (g) Co-User agrees to keep the existence of, and terms of this Agreement confidential, unless required by law, and if so required by law, shall provide Company with advance notice and an opportunity to seek a protective order or other similar action

2. In the event of Co-User's breach of any representation, warranty, covenant or agreement hereunder or other default hereunder (other than a payment default, in which case Company may terminate this Agreement immediately and without notice and opportunity to cure), which said breach or default is not cured within fifteen (15) days of written notice by Company, this Agreement may be terminated by Company, and such termination shall be effective from the date of issuance by Company to Co-User of notice of such termination. Telecommunications service provided by an underlying carrier and Co-User's right to use the Number may be terminated by Company at any time co-incident with or following the termination of this Agreement, or because of Co-User's violation of, or conflict with, any governmental laws, rules or regulations, fraud, shortage of network facilities and components or any other ground under applicable tariffs. Upon the termination of this Agreement, Co-User shall no longer have the right to use the Number and Co-User warrants, represents, acknowledges and agrees that, upon the termination of this Agreement, Co-User shall immediately cease its use of the Number, and shall cease any marketing of the Number. In the event of termination pursuant to this Paragraph 2, Co-User shall pay Company a termination fee equal to the sum of all Monthly Fees remaining in the Term, which is a reasonable estimate of Co-User's likely damages as a result of early termination of the Agreement and is not a penalty; Co-User acknowledges and agrees that this termination fee is fair and reasonable. Co-User will also promptly pay all Billed Charges, due up to and including the date of termination. Any and all rights associated with the Number will be retained by the Company, and the Company will be free to enter into an agreement with any third party with regard to the Number in the Territory or elsewhere. Upon termination or expiration of this Agreement, the indemnification provisions set forth in the Agreement and Standard Terms and Conditions expressly survive indefinitely, including Section 5 of the Agreement and Section 13 of the Standard Terms and Conditions. The following provisions also expressly survive

6. The Agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of the Agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York. All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of the Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New York, or the Federal District courts, located in New York County. Co-User hereby submits to the jurisdiction of the aforesaid courts and agrees that any process in any such action or proceeding may be served upon Co-User by delivery or mail in the same manner as notices pursuant to paragraph 8 below.

7. The Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, permitted assigns and representatives. Company shall have the right to assign the Agreement. Co-User shall not have the right to assign, sublet or sublicense the Agreement or any of its rights or interests hereunder without Company's prior written consent. Any purported assignment by Co-User in violation of this paragraph shall be void ab initio.

8. All notices to Co-User shall be sent to Co-User at the addresses first mentioned herein in the Agreement All notices to Company, and requests for Company's consent or approval, shall be sent to Company at the address first mentioned herein[in the Agreement?] Each party may hereafter designate any other address by notice in writing to the other party. All notices shall be in writing and shall be sent by registered or certified mail, return receipt requested. The date of any notice hereunder shall be deemed the date of the mailing thereof.

9. Nothing in the Agreement shall constitute a partnership, joint venture or other agency relationship between Co-User and Company. Company is performing all of its obligations hereunder as an independent contractor. Co-User does not have the right to execute any agreement or incur any obligation for which Company may be liable or otherwise bound; nor shall Company be liable for any representation, act or omission of Co-User that is contrary to the provisions hereof. The Agreement shall not be binding upon any party until signed by a duly authorized officer of such party, and countersigned by all other parties (or their duly authorized officers). The Agreement may be executed in counterparts, and may also be executed by means of faxed signature pages, though the parties will endeavor to replace any faxed signature pages with original signature pages at the parties' earliest convenience. Notwithstanding the foregoing, once the Agreement is fully executed by faxed signature pages, the Agreement will be in full force and effect and shall be fully binding for all purposes (regardless of the delivery or non-delivery of original signature pages thereafter).

10. Each party hereto has participated equally in the preparation and negotiation of the Agreement and each party hereto hereby unconditionally and irrevocably waives to the fullest extent permitted by law any rule of interpretation or construction requiring that the Agreement be interpreted or construed against the drafting party. Each party hereto agrees to execute and deliver such additional documents and instruments, and to perform such additional acts as may be reasonably necessary or appropriate to effectuate the intent, purpose and provisions of the Agreement.

11. If any provision contained in this Agreement shall be invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality and enforceability of the remaining provisions contained herein or therein shall not in any way be affected or impaired.

12. In the event that Company commences a legal action or incurs other costs to enforce its rights under this Agreement (including, without limitation, collection company fees), Company shall be entitled to recover its reasonable attorneys' fees and/or costs from Co-User.

Primary Wave Media LLC & [Phoong Law Corp.]                                  INITIALS: _____

termination or expiration of the Agreement:  the confidentiality provision set forth in Section 1(g) of the Standard Terms and Conditions, and Sections 6, 11 and 12 of the Standard Terms and Conditions.

3.  The Agreement constitutes the entire understanding of the parties hereto relating to the subject matter hereof and, except as otherwise provided herein, cannot be changed except by an instrument signed by the parties hereto.  No waiver by any of the parties hereto of any provision of or any default under the Agreement shall constitute a waiver by the particular party of compliance thereafter with the same or any other provision or of such party's respective right to enforce the same or any other provision thereafter.

4. Co-User warrants, represents and agrees that it shall not use the Number for any unlawful or deceptive purpose. Co-User is expressly prohibited from using the Number to transmit any unlawful, deceptive, harmful, threatening, abusive, libelous, vulgar, obscene, profane, hateful, or otherwise objectionable information of any kind, including, but not limited to, encouraging conduct that would constitute a criminal offense, infringe third party rights, give rise to civil liability or otherwise violate any local, state, national or other law. Co-User may not use the Number to upload, post, reproduce or distribute, in any way, any information, software or other material protected by copyright or any other intellectual property right without first obtaining the permission of such right by holder. Co-User represents that Co-User is at all times in compliance with all applicable laws, regulations, or conventions including those related to data privacy, international communications, and exportation of technical or personal data.

5. COMPANY MAKES NO EXPRESS OR IMPLIED WARRANTIES TO CO-USER, ITS AFFILIATES, INCLUDING ANY CO-USER REPRESENTATIVES, OR ANY THIRD PARTY AS TO THE DESCRIPTION, QUALITY, MERCHANTABILITY, COMPLETENESS OR FITNESS FOR ANY PURPOSE OF THE SERVICES PROVIDED. COMPANY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE.

**Remainder of this page intentionally left blank.**

13. Co-User understands and acknowledges that third parties may have intellectual property rights in the word or words that correspond with the Number.   Accordingly, Co-User shall use the Number at its own risk, and shall indemnify and hold Company and Company Representatives harmless from any and all claims from third parties that the Number infringes upon such third party's intellectual property rights. Co-User represents that it will not use the Number in a manner that infringes the trademark or other intellectual property rights of third parties.

14. Notwithstanding any provision contained in this Agreement, neither party shall be liable to the other to the extent fulfillment or performance of any terms or provisions of this Agreement are delayed or prevented by revolution or other civil disorders; wars; strikes; labor disputes; fires; floods; nuclear incident; acts of God; terrorism; government action; or, without limiting the foregoing, any other causes not within its control and which, by the exercise of reasonable diligence, it is unable to prevent. This clause shall not apply to the payment of any sums due under this Agreement by either party to the other.

15. 15. Company may issue a press release or otherwise make a public statement with respect to this agreement. Company shall not release any copyrighted, trademarked or proprietary information belonging to or assigned to Co-User, or the Monthly Fee paid to Company by Co-User.



**Schedule 1**

Please fill out the contact section completely then **choose one (1) payment option** from below by checking the appropriate box.  Fill out the requested fields and sign and date where indicated.

## CONTACT INFORMATION

Company Name: Phoong Law Corp.

Contact Name: Anh Phoong

Contact Email: anh@phoonglawcorp.com

Contact Phone: 916-475-6466

Contact Fax: _____

## ☐ CREDIT CARD PAYMENT OPTION

Cardholder Name: Ah Phoong

Card Type (MC, Visa, Amex, Discover) Visa

Account Number: 4246 3152 1248 7910

EXP Date: 12/18

CVS: 279

## ☐ DEBIT CHECKING ACCOUNT PAYMENT OPTION / e-Check

Co-User's Name (as it appears on Bank account): _____

Bank Account Type: ☐ Checking ☐ Savings ☐ Business Checking

Bank ABA Routing Number: _____

Bank Account Number: _____

| | |
|---|---|
| **Authorized Signature:** _~~DocuSigned by:~~_ <br> *6997496A1C6F4BF...* | **Date:** 1/4/2017 |
| **Printed Name:** Anh  Phoong | **Title:** Ap |

By signing above, I hereby authorize Primary Wave Media, LLC and the underlying telecommunication carrier, to charge the above referenced credit card or debit the indicated checking account automatically each month for the agreed upon charges including but not limited to, Billed Charges, as such term is defined in the Intelligent Number Bundled Marketing Services Agreement.  I am authorized to incur charges from the credit card I have provided, or to have monies deducted from the bank account I have provided and there are sufficient funds in the bank account to cover the charges to be incurred.

Primary Wave Media LLC & [Phoong Law Corp.]                    INITIALS: _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

# EXHIBIT C



1 of 6

## Toll-Free Marketing Services Agreement

This Toll-Free Marketing Services Agreement, including the Standard Terms and Conditions attached hereto and incorporated by reference (this "Agreement"), is entered into by and between RingBoost, a Division of Primary Wave Media, LLC, a Delaware limited liability company with an address of 49 Marble Ave., Pleasantville, New York 10570 (the "Company") and **Phoong Law Corp.** with an address of **[1860 Howe Avenue Suite 250, Sacramento, CA 95825]** the "Co-User"), dated as of **February 9th, 2024** for certain Toll-Free Marketing Services (as hereinafter defined).

1.      During the Term (as hereinafter defined) of this Agreement, Company will provide the Toll-Free Marketing Services defined below and grant the Co-User the exclusive right to use the telephone numbers **1-866-468-7246** (the "Number") in the Territory (as hereinafter defined), subject to any and all rules, obligations and conditions under applicable tariffs (including, without limitation, tariffs in relation to the non-payment for service, abuse of service or fraud), statutory and common law and any other applicable laws or regulations promulgated by agencies having jurisdiction over the subject matter hereof. Co-User acknowledges that Company may provide services to third parties using the Number in geographic areas other than the Territory during the Term of this Agreement or in the Territory upon termination or expiration of this Agreement.  In addition and included with the fees described below, during the Term, Company shall provide to Co-User the following services in accordance with the terms and conditions of this Agreement: a) vanity toll free consulting services, including but not limited to, deployment, IVR and routing solutions, tracking and reporting options in connection with the Location(s) (as hereinafter defined) designated by Co-User from time to time; b) vanity toll free marketing assistance and strategy provided to Co-User and its advertising agency on an as needed basis; c) access to special offers given to other Company licensees from outside vendors; and d) the Toll-Free Services defined below. The services set forth in a) through d) above and the Number shall be collectively referred to herein as the "Toll-Free Marketing Services." Company will provide the services set forth in a) and b) above on an on-going basis during the Term, and, unless otherwise mutually agreed in writing by the parties, Company's total time spent on such services shall not exceed three (3) hours per month. As used herein, "Territory" shall mean **[area codes 562, 619, 626, 661, 805, 858, 909, 949, 951, 213, 310, 424, 323, 747, 818, 760, 442, 714, 657, 350, 837, 840, 369, 738, & 341 within state of California]** As used herein, "Location(s)" shall mean the place or places designated from time to time in writing by Co-User as the location to which calls to the Number shall be routed to  916-957-2282___ **(Insert 10-digit ring-to number). Co-User understands and agrees that the Number has been assigned to the Company directly through a RespOrg utilizing the SMS/800 Database; and that subscribership of the Number cannot be transferred from Company to Co-User or any other party for any reason.**

2.      This Agreement shall be effective on the date of its execution (the "Effective Date") and shall have an **initial term of One (1) year** (the "Initial Term"), unless terminated by Company in accordance with Paragraph 2 of the Standard Terms and Conditions hereof.  At the end of the Initial Term, or any Renewal Term as defined below, Co-User shall have the option to renew for one (1) additional month (the term of any such renewal being referred to herein as a "Renewal Term") by giving Company an irrevocable written notice of such renewal at least five (5) days prior to the expiration of the then-current Initial Term or Renewal Term. If Co-User fails to provide Company with either a notice of renewal or a notice of cancellation at least five (5) days prior to the expiration of the then-current Initial Term or Renewal Term, this Agreement shall be automatically renewed for an additional successive one (1) month term, with all other terms and conditions set forth herein in full force and effect. The Initial Term and any Renewal Terms shall be collectively referred to herein as the "Term."

3.      (a)      Co-User shall pay the following amounts to Company: (i) a monthly marketing fee of **$350.00/mo** (the "Monthly Fee"), with the first Monthly Fee due upon execution of this Agreement; (ii) all telephone charges billed by any and all telecommunications carrier(s), together with all Federal, State, municipal and all other local taxes, surcharges and regulatory fees of any description billed by any such telecommunications carrier(s) ("Telecom Charges") and (iii) upon the execution of this Agreement, a **$0** set-up fee ("Set-Up Fee"). (The Telecom Charges, together with the Monthly Fee, the Set-up Fee, are hereinafter referred to as the "Billed Charges"), which are attributable to Co-User's use of the Number.  **The Telecom Charges shall be $0.05 per minute plus applicable taxes, after the first included 100 minutes per month**.  Co-User may receive billing statements and receipts from Company for Telecom Charges when Company is acting as a billing agent for the underlying telecommunications carrier. If Company is not acting as a billing agent for the underlying telecommunications carrier, Co-User will be

INITIALS: _____



2 of 6

billed directly by the telecommunications carrier and shall pay the Telecom Charges to such carrier when due. Co-User warrants, represents, acknowledges, and agrees that Co-User shall be solely responsible for and shall pay any and all Billed Charges incurred on and after the Effective Date as provided in (b) below.  Upon each Renewal Term hereof, Company shall have the right to increase the Monthly Fee at any time or times, provided that increases shall not exceed five percent (5%), during anyone (1) year period, based on the Monthly Fee of the last month of the preceding term.  In the event that the underlying telecommunications carrier notifies Company of a rate change on Company that increases the per minute charge, Company shall increase the Telecom Charges to Co-User.

((b)      Company will bill Co-User monthly, in advance, for the Monthly Fee.  All Billed Charges shall be paid by credit card on which Co-User, or a principal of Co-User, is an authorized signatory.  The credit card shall be valid, in good standing, and able to incur new charges.  A credit card authorization form ("Authorization Form") is attached hereto as Schedule 1 and incorporated herein by this reference and the undersigned, on behalf of Co-User and the undersigned shall complete and execute the Authorization Form upon the execution of this Agreement.  Co-User will keep the credit card on file current and will immediately provide Company with updated credit card information should the credit card on file expire or be cancelled, suspended or unable to incur new charges. Failure to pay the Billed Charges within 5 days after the billing due date any month during the Term may result in termination of the Bundled Marketing Services (or the Agreement pursuant to Paragraph 2 of the Standard Terms and Conditions) and, at the Company's sole discretion, a reconnect fee of $250 will be due in order to reinstate the Bundled Marketing Services for the remaining duration of the Term, provided, however, that the reconnect fee, if allowed by the Company, may only be paid within 30 days of the date that the late payment became due. After 30 days, Co-User shall have no option to reconnect or reinstate the Bundled Marketing Services and the Company may freely enter into contracts with third parties concerning the Number in its sole discretion.  Interest shall accrue at the rate of 1% per month on all amounts not paid within 10 days of the billing statement and processing charges will apply if a payment is declined ($10 per credit card decline, $20 per returned EFT). If collection efforts are required, Co-User shall be liable to Company for all costs of collection, including reasonable attorney's fees and fees and expenses of any outside collection agencies.

5.      Co-User and its shareholders, directors, officers, employees, agents, contractors, successors and assigns, affiliates and subsidiaries (such parties being collectively referred to herein as "Co-User Representatives") shall indemnify and hold Company and its shareholders, directors, officers, employees, agents, contractors, successors and assigns, affiliates and subsidiaries ( such parties being collectively referred to herein as "Company Representatives") harmless of and from any and all costs and expenses (including, without limitation, reasonable attorneys' fees), losses, claims, liabilities or obligations, incurred by Company or its Representatives arising out of Co-User's or  Co-User Representatives' acts or inactions relating to its or their use of the Number or of the Toll-Free Marketing Services, or any other acts or omissions of Co-User and/or the Co-User Representatives s related to the subject matter of this Agreement including any negligent or willful or reckless act by Co-User or the Co-User Representatives or due to any breach of this Agreement. **IN NO EVENT SHALL COMPANY OR ITS SUPPLIERS' OR COMPANY REPRESENTATIVES' HAVE ANY LIABILITY TO CO-USER OR CO-USER REPRESENTATIVES REGARDLESS OF CAUSE OR FORM OF ACTION, EXCEED THE VALUE OF THE MONTHLY FEE OF THE MONTH PRECEDING THE INCIDENT GIVING RISE TO SUCH DAMAGES.  IN NO EVENT SHALL COMPANY OR COMPANY REPRESENTATIVES BE LIABLE TO CO-USER OR ANY OTHER PERSON, FIRM OR ENTITY IN ANY RESPECT, WITHOUT LIMITATION, FOR INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, ACTUAL, OR PUNITIVE DAMAGES, OR ANY LOST PROFITS OF ANY KIND.** Co-User and Co-User Representatives agree that Company shall not be responsible for any interruption of service caused by any reason whatsoever whether or not subject to the control of Company.  In the unlikely event of a service outage, Company will refund Co-User's Monthly Fee, on a pro-rata basis, for the length of the service outage. If a service problem occurs, Co-User agrees to notify Company immediately by calling 914-200-0000 or emailing support@ringboost.com.

6.      Co-User understands and agrees that Company shall at all times remain the subscriber of record and end user for the Number during the Term and afterwards.  Co-User shall have no ownership, leasehold, or proprietary interest in the Number.  Co-User agrees that it shall use its good faith efforts to ensure that the Number remains utilized with active telephonic traffic during the Term.  Company will have total and complete control of which carrier carries Intra/Inter LATA traffic. Co-User has no rights to become the subscriber of record of the Number, to port the Number to a different carrier, to submit any letter of authorization to any carrier or RespOrg, or to encourage or assist any other third party to do so. Any and all rights to the Number will be retained by Company. If Co-User attempts to remove or removes any Number from its current RespOrg, it will be considered a breach of this

INITIALS: _____  AP



3 of 6

Agreement by Co-User and, in addition to Company's rights under Section 2 of the Standard Terms and Conditions, Company will charge Co-User an inconvenience fee of $500 upon the first instance, $1,000 upon the second instance and $5,000 for any instance thereafter. Co-User will cooperate and use good faith efforts to ensure the return of the Number to Company.  Co-User acknowledges Company's right, title, and interest in and to the subscription rights to the Numbers and will not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of that right, title, and interest, or to encourage or assist any other third party to do so. In connection with Co-User's use of the Number, Co-User will not in any manner represent that it has any ownership in the Number and Co-User acknowledges that use of the Number will not create in Co-User's favor any right, title, or interest in or to the Number.  Co-User understands and agrees that Company is not a telecommunications carrier and is not providing telecommunications services to Co-User under any applicable federal or state statute, regulation, rule, order or guidance.  Co-User understands and agrees that the telecommunications services are provided by telecommunications carriers of Company's selections and that Company is not Co-User's telecommunications provider.  Rather, Company is providing the Toll-Free Marketing Services specified herein.  Co-User understands and agrees that its payment to Company is the Monthly Fee for the Toll-Free Marketing Services; the underlying telecommunications carrier is imposing any charges for telecommunications services, and that carrier collects any due taxes, surcharges, or regulatory fees.  Company may act as a billing agent for the underlying telecommunications carrier.  While Co-User may receive a billing statement from Company in its capacity as a billing agent, the Telecom Charges are imposed by the underlying telecommunications carrier and the taxes, surcharges and regulatory fees are charged by the underlying telecommunications carrier rather than Company.

7.      This Agreement, together with the Standard Terms and Conditions attached hereto and incorporated herein by this reference, constitutes the entire agreement between Company and Co-User as to the subject matter hereof, and supersede all previous agreements, warranties or representations, oral or written, which may have been made between Company and Co-User as to the subject matter hereof.

        IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

ACCEPTED AND AGREED TO:

ACCEPTED AND AGREED TO:

_____
RingBoost

DocuSigned by:

**ANH PHOONG**

27879CA5324B4DF...
_____
Co-User - Signature

ANH  PHOONG      Anh  phoong
_____
Print Name & Title

2/9/2024
_____
Date



INITIALS: _____



## STANDARD TERMS AND CONDITIONS

1. Co-User warrants, represents, acknowledges and agrees as follows: (a) Co-User has the full right and power to enter into and fully perform this Agreement and to make the representations, warranties and covenants contained herein, has entered into the Agreement freely and voluntarily, and is empowered to execute the Agreement; (b) Company has not made any statement or representation to Co-User regarding any fact relied upon by Co-User in entering into this Agreement, and Co-User has not relied upon any statement, representation or promise made by Company in executing the Agreement, except as expressly stated in the Agreement; (c) Co-User shall be solely responsible for and shall pay any and all charges, fees and/or any other sums payable in connection with Co-User's use of the Number, including, without limitation, all amounts payable pursuant to Paragraph 4 of the Agreement; (d) There exists, at commencement of the Agreement and for all periods thereunder, no legal reason that Company should deny services to Co-User; that Co-User is of legal majority age (*i.e.*, 18 years of age or older in most jurisdictions), in the case Co-User is an individual; and that Co-User's use of the Number is not for any illegal or injurious purpose or purposes.  Co-User represents and warrants that Co-User will not intercept or attempt to intercept the communications of others using the Number or interfere with others' use of the Number in any manner.  Co-User will comply with all applicable laws, regulations, and legal requirements applicable to Co-User's use of the Number; (e) Co-User shall test the Number, without charge, before marketing such Number or incurring other expenditures; (f) Co-User is sharing the use of the Number and agrees that it has no ownership or leasehold interest in the Number.  Co-User has no right to port the Number to a different telecommunications provider than chosen by Company and has no right to take any action or to assist or encourage others to take any action to become the subscriber of record of the Number or to hold itself out to third parties as a subscriber or as having authority over the Number; and (g) Co-User agrees to keep the existence of, and terms of this Agreement confidential, unless required by law, and if so required by law, shall provide Company with advance notice and an opportunity to seek a protective order or other similar action

2. In the event of Co-User's breach of any representation, warranty, covenant or agreement hereunder or other default hereunder (other than a payment default, in which case Company may terminate this Agreement immediately and without notice and opportunity to cure), which said breach or default is not cured within fifteen (15) days of written notice by Company, this Agreement may be terminated  by Company, and such termination shall be effective from the date of issuance by Company to Co-User of notice of such termination.  Telecommunications service provided by an underlying carrier and Co-User's right to use the Number may be terminated by Company at any time co-incident with or following the termination of this Agreement, or because of Co-User's violation of, or conflict with, any governmental laws, rules or regulations, fraud, shortage of network facilities and components or any other ground under applicable tariffs.  Upon the termination of this Agreement, Co-User shall no longer have the right to use the Number and Co-User warrants, represents, acknowledges and agrees that, upon the termination of this Agreement, Co-User shall immediately cease its use of the Number, and shall cease any marketing of the Number.  In the event of termination pursuant to this Paragraph 2, Co-User shall pay Company a termination fee equal to the sum of all Monthly Fees remaining in the Term, which is a reasonable estimate of Co-User's likely damages as a result of early termination of the Agreement and is not a penalty; Co-User acknowledges and agrees that this termination fee is fair and reasonable. Co-User will also promptly pay all Billed Charges, due up to and including the date of termination. Any and all rights associated with the Number will be retained by the Company, and the Company will be free to enter into an agreement with any third party with regard to the Number in the Territory or elsewhere. Upon termination or expiration of this Agreement, the

6.  The Agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of the Agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York.  All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of the Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New York, or the Federal District courts, located in New York County.  Co-User hereby submits to the jurisdiction of the aforesaid courts and agrees that any process in any such action or proceeding may be served upon Co-User by delivery or mail in the same manner as notices pursuant to paragraph 8 below.

7.  The Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, permitted assigns and representatives.  Co-User shall have the right to assign the Agreement.  Co-User shall not have the right to assign, sublet or sublicense the Agreement or any of its rights or interests hereunder without Company's prior written consent.  Any purported assignment by Co-User in violation of this paragraph shall be void ab initio.

8.  All notices to Co-User shall be sent to Co-User at the addresses first mentioned herein in the Agreement All notices to Company, and requests for Company's consent or approval, shall be sent to Company at the address first mentioned herein. Each party may hereafter designate any other address by notice in writing to the other party.  All notices shall be in writing and shall be sent by registered or certified mail, return receipt requested.  The date of any notice hereunder shall be deemed the date of the mailing thereof.

9.  Nothing in the Agreement shall constitute a partnership, joint venture or other agency relationship between Co-User and Company.  Company is performing all of its obligations hereunder as an independent contractor.  Co-User does not have the right to execute any agreement or incur any obligation for which Company may be liable or otherwise bound; nor shall Company be liable for any representation, act or omission of Co-User that is contrary to the provisions hereof.  The Agreement shall not be binding upon any party until signed by a duly authorized officer of such party, and countersigned by all other parties (or their duly authorized officers).  The Agreement may be executed in counterparts, and may also be executed by means of faxed signature pages, though the parties will endeavor to replace any faxed signature pages with original signature pages at the parties' earliest convenience. Notwithstanding the foregoing, once the Agreement is fully executed by faxed signature pages, the Agreement shall be in full force and effect and shall be fully binding for all purposes (regardless of the delivery or non-delivery of original signature pages thereafter).

10.  Each party hereto has participated equally in the preparation and negotiation of the Agreement and each party hereto hereby unconditionally and irrevocably waives to the fullest extent permitted by law any rule of interpretation or construction requiring that the Agreement be interpreted or construed against the drafting party.  Each party hereto agrees to execute and deliver such additional documents and instruments, and to perform such additional acts as may be reasonably necessary or appropriate to effectuate the intent, purpose and provisions of the Agreement.

11. If any provision contained in this Agreement shall be invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality and enforceability of the remaining provisions contained herein or therein shall not in any way be affected or impaired.

12. In the event that Company commences a legal action or incurs

INITIALS: _____



5 of 6

indemnification provisions set forth in the Agreement and Standard Terms and Conditions expressly survive indefinitely, including Section 5 of the Agreement and Section 13 of the Standard Terms and Conditions.  The following provisions also expressly survive termination or expiration of the Agreement:  the confidentiality provision set forth in Section 1(g) of the Standard Terms and Conditions, and Sections 6, 11 and 12 of the Standard Terms and Conditions.

3.  The Agreement constitutes the entire understanding of the parties hereto relating to the subject matter hereof and, except as otherwise provided herein, cannot be changed except by an instrument signed by the parties hereto.  No waiver by any of the parties hereto of any provision of or any default under the Agreement shall constitute a waiver by the particular party of compliance thereafter with the same or any other provision or of such party's respective right to enforce the same or any other provision thereafter.

4. Co-User warrants, represents and agrees that it shall not use the Number for any unlawful or deceptive purpose. Co-User is expressly prohibited from using the Number to transmit any unlawful, deceptive, harmful, threatening, abusive, libelous, vulgar, obscene, profane, hateful, or otherwise objectionable information of any kind, including, but not limited to, encouraging conduct that would constitute a criminal offense, infringe third party rights, give rise to civil liability or otherwise violate any local, state, national or other law. Co-User may not use the Number to upload, post, reproduce or distribute, in any way, any information, software or other material protected by copyright or any other intellectual property right without first obtaining the permission of such right by holder. Co-User represents that Co-User is at all times in compliance with all applicable laws, regulations, or conventions including those related to data privacy, international communications, and exportation of technical or personal data.

5. COMPANY MAKES NO EXPRESS OR IMPLIED WARRANTIES TO CO-USER, ITS AFFILIATES, INCLUDING ANY CO-USER REPRESENTATIVES, OR ANY THIRD PARTY AS TO THE DESCRIPTION, QUALITY, MERCHANTABILITY, COMPLETENESS OR FITNESS FOR ANY PURPOSE OF THE SERVICES PROVIDED. COMPANY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE.

other costs to enforce its rights under this Agreement (including, without limitation, collection company fees), Company shall be entitled to recover its reasonable attorneys' fees and/or costs from Co-User.

13. Co-User understands and acknowledges that third parties may have intellectual property rights in the word or words that correspond with the Number.   Accordingly, Co-User shall use the Number at its own risk and shall indemnify and hold Company and Company Representatives harmless from any and all claims from third parties that the Number infringes upon such third party's intellectual property rights. Co-User represents that it will not use the Number in a manner that infringes the trademark or other intellectual property rights of third parties.

14. Notwithstanding any provision contained in this Agreement, neither party shall be liable to the other to the extent fulfillment or performance of any terms or provisions of this Agreement are delayed or prevented by revolution or other civil disorders; wars; strikes; labor disputes; fires; floods; nuclear incident; acts of God; terrorism; government action; or, without limiting the foregoing, any other causes not within its control and which, by the exercise of reasonable diligence, it is unable to prevent. This clause shall not apply to the payment of any sums due under this Agreement by either party to the other.

**Remainder of this page intentionally left blank.**

DS

AP

INITIALS: _____



6 of 6

**Schedule 1**

Please complete the contact section completely, then <u>choose one (1) payment option</u> from below by checking the appropriate box.  Sign and date where indicated.

## CONTACT INFORMATION

Company Name:      Phoong Law Corp.

Contact Name:        Anh Phoong

Contact Email:        anh@phoonglawcorp.com

Contact Phone:

**☑ CREDIT CARD PAYMENT OPTION**

Cardholder Name: ___Anh salcedo_____

Card Type (MC, Visa, Amex, Discover)____Visa_____

Account Number: ___4246315371428697_____

EXP Date: ___1228____/_____

**☑ DEBIT CHECKING ACCOUNT PAYMENT OPTION / e-Check**

Co-User's Name (as it appears on Bank account): _____

Bank Account Type: □ Checking □ Savings □ Business Checking

Bank ABA Routing Number: _____

Bank Account Number: _____

| | |
|---|---|
| **Authorized Signature:** DocuSigned by: **ANH PHOONG** ___27879CA5324B4DE___ | **Date:** 2/9/2024 |
| **Printed Name:** ANH PHOONG | **Title:** Anh phoong |

By signing above, I hereby authorize RingBoost and if applicable, the underlying telecommunication carrier, to charge the above referenced credit card or debit the indicated checking account automatically each month for the agreed upon charges including but not limited to, Billed Charges, as such term is defined in the Toll-Free Marketing Services Agreement.  I am authorized to incur charges from the credit card I have provided, or to have monies deducted from the bank account I have provided and there are sufficient funds in the bank account to cover the charges to be incurred.



INITIALS: _____